FIRST INSURANCE COMPANY OF HAWAII, LTD., a Hawaii corporation, Plaintiff,

v.

CONTINENTAL CASUALTY COMPANY, an Illinois corporation, Defendant.

Civ. No. 2891.

United States District Court, D. Hawaii.

May 28, 1970.

Alexander C. Marrack, Honolulu, Hawaii (Anthony & Waddoups, Honolulu, Hawaii, of counsel), for plaintiff.

James F. Ventura, Libkuman, Shimabukuro & Ventura, Honolulu, Hawaii, for defendant.

## DECISION

TAVARES, District Judge.

The factual situation presented in this case offers very little basis for dispute and for the most part has been presented by stipulation. In dispute is the liability, if any, arising from policies of insurance issued by the respective parties within the factual situation as presented.

The plaintiff, First Insurance Company of Hawaii, hereinafter referred to as "First Insurance," issued standard comprehensive liability policies, combining automobile and general liability coverages, thereby insuring Park Engineering, Inc. (Park) as Engineers and Surveyors under policy No. HCL 9139 from May 16, 1966 to May 16, 1967 (Ex P–1); and Walter Lum Associates, Inc. (Lum) which firm is an architectural and engineering firm, under policy No. HCL 9566 from October 28, 1966 to October 28, 1967 (Ex P–2).

From Exhibit P–1 it appears that coverages A—Bodily Injury Liability, and B—Property Damage Liability—Automobile may be excluded from the present injury as neither form of coverage is

relevant. The remaining coverage, C—Property Damage Liability—Except Automobile—provides the pertinent portion of the insuring agreement [1] and specifies what coverage is provided under the policy.

Under the heading of "Exclusions" the printed form contains language [2] claimed to exclude injury to any building or structure due to the grading or filling of land. Plaintiffs further point out additional exclusions afforded by the "Amendatory Endorsement" forming a part of the policy, which provides:

"It is agreed that such insurance as is afforded by the policy excludes:

"1. The hazard arising out of faulty design, maps, plans and specifications.

"2. Coverage for claims arising out of the operations of contractor."

The Court's attention has been particularly invited to paragraph "14—Other Insurance" [3] generally referred to as

1. "1. Coverage C—Property Damage Liability—Except Automobile—To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, caused by accident."

"2. Defense, Settlement, Supplementary Payments—With respect to such insurance as is afforded by this policy, the company shall:

(a) defend any suit against the insured alleging such injury, sickness, disease or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient;

"(b) (1) * * *

"(2) pay all expenses incurred by the company, all costs taxed against the insured in any suit and all interest accruing after entry of judgment until the company has paid or tendered or deposited in court such part of such judgment as does not exceed the limit of the company's liability thereon;

"(3) * * *

"(4) * * *

and the amounts so incurred, except settlements of claims and suits, are payable by the company in addition to the applicable limit of liability of this policy."

2. "This policy does not apply—

"(a) * * *

"(1) under coverage C, to injury to or destruction of any property arising out of (1) blasting or explosion, other than the explosion of air or steam vessels, piping under pressure, prime movers, machinery or power transmitting equipment, or (2) the collapse of or structural injury to any building or structure due (a) to grading of land, excavation, borrowing, filling, backfilling, tunneling, pile driving, coffer-dam work or caisson work or (b) to moving shoring, under-

pinning, raising or demolition of any building or structure or removal or rebuilding of any structural support thereof; provided, however, this exclusion does not apply with respect to liability assumed by the insured under any contract covered by this policy, to operations performed for the named insured by independent contractors or to completed or abandoned operations within the meaning of paragraph 2 of the Products Hazard, and provided further that part (1) or part (2) of this exclusion does not apply to the operations stated, in this policy or in the company's manual, as not subject to such part of this exclusion.

"(m) Under coverage C, to injury to or destruction of wires, conduits, pipes, mains, sewers or other similar property, or any apparatus in connection therewith, below the surface of the ground, if such injury or destruction is caused by and occurs during the use of mechanical equipment for the purpose of grading of land, paving, excavating or drilling or to injury to or destruction of property at any time resulting therefrom; provided, however, this exclusion does not apply with respect to liability assumed by the insured under any contract covered by this policy, to operations performed for the named insured by independent contractors, to completed or abandoned operations within the meaning of paragraph 2 of the Products Hazard, or to operations stated, in this policy or in the company's manual, as not subject to this exclusion;"

3. "14. Other insurance. If the insured has other insurance against a loss covered by this policy the company shall not be liable under this policy for a greater proportion of such loss than the applicable limit of liability stated in the declarations bears to the total applicable limit of liability of all valid and collectible insurance against such loss; provided, however, the

**810**

a "pro-rata" clause and to paragraph "15—Subrogation." [4]

The Limits of Liability under Parks coverage "C" for Property Damage Liability was $100,000 for each person; $100,000 for aggregate operation for an aggregate protective $100,000. Aggregate products was "not covered" but an Aggregate Contractual Limit of $100,000 was specified. Under Lum's coverage "C" for Property Damage Liability was a limit of $50,000 for each person; $50,000 for aggregate operation for an aggregate protection of $50,000. Aggregate products was "not covered" but an Aggregate Contractual Limit of $50,000 was specified. The foregoing represents the applicable provisions of the policies which had been written by the plaintiff company.

Turning now to the position of the defendant, we find that the defendant company had executed Standard Architects' and Engineers' Professional Liability Policies to Park (Ex P-3) and to Lum (Ex P-4). The Park policy covered a period from September 24, 1965 to September 24, 1966. Under this policy, No. 948 82 20, a Limit of Liability Per Claim was specified as $250,000 with a Deductible item of $3,000, by paragraph 5 of the policy. Paragraph 6 thereof provides for a Loss Contribution of $2,000, which is 25% of $8,000 of Net Loss; and Aggregate Amount Payable of $250,000. Part 1—Insuring Agreements under 1. Coverage, provides:

"The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages if legal liability arises out of the performance of professional services for others in the insured's capacity as an architect or an engineer and if such legal liability is caused by an error, omission or negligent act."

The Lum Policy No. 949 05 45 is identical to the Park policy as described above as to Coverage, Limit of Liability and Deduction. Both policies under Part IV respectively provide that:

"6. Other Insurance

"This policy is in excess to all other valid and collectible insurance and shall not be called upon in contribution."

Both, under paragraph 7 of Part IV, provide for subrogation in substantially the same language as provided by the First policies.[4]

Both contain identical exclusions under Part II—Exclusions. Of interest here is the provision of 1. (c) which provides:

"1. This policy does not apply to claims arising out of:

"(c) the making of, or absence of, boundary surveys, surveys of the sub-surface condition, or ground testing, unless specifically endorsed hereon."

Attached to the Park policy (Ex P-3) is the following:

"Removal of Boundary Surveys Exclusion.

"In consideration of the premium charged, it is hereby understood and agreed that the words 'boundary surveys' are deleted from paragraph 1. (c) of Part II, Exclusions."

In simple terms, the effect of this endorsement was to include "boundary surveys" within the performance of professional services of the coverage provided for Park. This was after all an integral part of the services which Park engaged to perform.

insurance under this policy with respect to loss arising out of the maintenance or use of any hired automobile insured on a cost of hire basis or the use of any non-owned automobile shall be excess insurance over any other valid and collectible insurance."

4. "15. Subrogation. In the event of any payment under this policy, the company

shall be subrogated to all the insured's rights of recovery therefor against any person or organization and the insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The insured shall do nothing after loss to prejudice such rights."

Attached to the Lum policy (Ex P-4) is the following:

"Removal of Surveys of the Sub-Surface Condition to Ground Testing Exclusion.

"In consideration of the premium charged, it is hereby understood and agreed that the words 'surveys of the sub-surface condition' and 'ground testing' are deleted from paragraph 1. (c) of Part II, Exclusions."

Again, in simple terms, the effect of this endorsement was to include "surveys of the sub-surface condition" and "ground testing" within the performance of professional services of the coverage provided under the Lum policy because this was the very type of service which Lum undertook to provide.

Boiled down, the Court finds that First Insurance undertook to insure Park and to pay on its behalf all sums, without exclusion, which Park became legally obligated to pay as damages because of injury to or destruction of "property" caused by accident to the extent of $100,000. This policy contained a standard "pro-rata" clause with respect to other insurance and a standard subrogation clause. The policy which First Insurance issued to Lum contained the same coverage as provided to Park, but the limit of liability for Lum was only $50,000.

Continental Casualty undertook to insure Park by agreeing to pay on its behalf all sums as Park might become legally obligated to pay as damages for legal liability arising out of the performance of professional services for others if such liability be caused by an error, omission or negligent act of Park, to the extent of $250,000, subject to a deductible amount of $3,000 plus a further loss contribution of 25% of $8,-000 or $2,000 of any net loss to the insurance company. Applied to the situation before the Court the provisions provide for deducting the first $3,000 of any loss plus an additional $2,000 because the amount here involves a net loss in excess of $8,000. This policy contains a standard Other Insurance clause providing that "This policy is in excess to all other valid and collectible insurance and shall not be called upon in contribution." The policy which Continental issued to Lum was substantially the same as the policy issued to Park, with the same limit of liability, and provisions for deductions.

With the stage thus set, we will turn to the action which has generated the controversy. A limited partnership known as HSM Ventures owned a parcel of land which they designated as the Waipahu Industrial Park Development, closely adjacent to Pearl Harbor. In connection with the development of this real estate, HSM verbally contracted with Park for him to provide engineering and supervisory services. Park prepared a boundary survey and specifications for grading the area. The latter involved moving a large quantity of earth and fill material in accordance with a grading plan dated July 7, 1965, which had been prepared by Park. Park verbally retained Lum to assist with all phases of the soil engineering work, including field investigations, boring, soil report and supervision of soil work and compaction tests as appropriate for all fills made during the construction phase. Lum approved the grading plan which was also approved by the City and County of Honolulu. HSM entered into a written contract with Hawaiian Dredging and Construction Co., Ltd., to perform the work specified.

At some point of the construction phase of this contract, a large quantity of excess material was generated. It became necessary to remove this material by hauling it from the site or to make some other disposition of it. Park made a decision to spread the material at the site, which resulted in an increase in the height of dirt by about ten (10) feet, over and above the grade specified in the grading plan at the particular point which is here significant and hereinafter designated as the slide area. Hawaiian Dredging complied with the directions given by Park, using approved

procedures for spreading to facilitate proper impacting. Lum was never consulted as to the grading change but did check the impacting. The City and County of Honolulu was never advised of any change in the grading plan, and consequently gave no approval for such a change. The grading at the particular point of the slide area had been completed by Hawaiian Dredging several days before March 22, 1966. On that date the compacted soil and fill material caused a downward vertical displacement of some three to five feet, accompanied by an upward vertical and lateral displacement of land adjacent to the Industrial Park boundary, but outside of its perimeter.

The United States Government is the owner of land which lies between Pearl Harbor and the harbor side of the Industrial Park Development and so owned such land during March of 1966 and prior thereto. Prior to March of 1966 the Government had granted to Standard Oil Company of California an easement through part of its land adjacent to the Industrial Park Development, for the purpose of enabling Standard Oil to install, and under which Standard Oil had installed, underground pipe lines across the Government property. On March 22, 1966 the slide, described above, occurred. The displacement which accompanied the slide extended beyond the boundaries of the Industrial Park Development and caused an upward vertical and lateral displacement to occur on the adjacent Government land of a nature which resulted in the displacement of the Standard Oil Company oil lines and a breakage in one of them.

Standard Oil Company filed suit in this court on July 22, 1966, being Civil Action No. 2549, seeking damages in the amount of $29,629.88 plus interest, costs and attorneys' fees. The Oil Company plaintiff named, as defendants, Park Engineering, Inc., Walter Lum Associates, Inc., and Hawaiian Dredging and Construction Co., Ltd. On June 7, 1968 the Court granted a summary judgment in favor of Walter Lum Associates, Inc., and thereupon dismissed the complaint against Lum with prejudice. The case proceeded to trial before the Court sitting without jury and, at the conclusion thereof and on the 13th day of June 1968, the Court, The Honorable Martin Pence presiding, resolved the issue of liability and rendered his decision (Ex P-8) for the plaintiff and against the defendant Park Engineering, Inc., holding thereby that Park "was negligent in the manner in which they proceeded with the filling of the particular area in that they did not follow the usual sound engineering practices" required; further holding that Park Engineering and only Park was responsible for the subsoil earth movement which occurred, and was legally liable for the injury suffered by the plaintiff. Action against the defendant Hawaiian Dredging and Construction Co., Ltd. was dismissed and judgment so ordering was duly entered on June 20, 1968. After the Court's finding as to the liability of Park Engineering, Inc., a stipulation was entered into between plaintiff, Standard Oil Company and Park whereby and on August 13, 1968, Judgment in favor of the plaintiff in the sum of $19,750.00 was duly entered. Satisfaction of Judgment was filed by plaintiff on August 20, 1968.

Detail regarding notices to the respective insurance carriers is relatively unimportant to the determination of this case. Suffice it to say that plaintiff and defendant both received timely notification of the damage claimed by Standard Oil Company. First Insurance undertook to defend Park and Lum and to all intents and purposes Continental declined to do so, asserting the deductible provisions contained in their policies with further reliance upon the provisions stipulating that their policies were "excess" to any other insurance in force. As noted above, First Insurance represented Park throughout the Standard Oil litigation and satisfied the judgment rendered against Park. First Insurance also represented Lum up to the point at which summary judgment was

entered in favor of Lum absolving Lum of any liability whatever. By its Complaint herein, First Insurance now seeks judgment against Continental for reimbursement of the amount which it paid to satisfy the Standard Oil judgment, together with costs, expenses and attorneys' fees expended on behalf of Park and Lum, all in the total sum of $30,288.74. The contentions of the parties are set forth fully in the Pre-Trial Order (R. 44).

■ At the outset the Court finds that it has jurisdiction in the foregoing matter. Plaintiff is a corporation incorporated under the laws of the State of Hawaii and has its principal place of business in the State of Hawaii. The defendant is a corporation incorporated under the laws of the State of Illinois and maintains its principal place of business in a state other than Hawaii. The matter in controversy exceeds, exclusive of interest and costs, the sum of $10,-000. Without repeating the Admitted Facts (R. 50–52) as they have been substantially related above, the Court expressly adopts the Admitted Facts as proven and hereby incorporates Admitted Facts 2 through 16 inclusive of the Pre-Trial Order, as the Court's findings of facts as though set forth verbatim herein. In addition thereto, the Court finds that the policy of insurance issued by First Insurance to Park did provide insurance coverage to Park for the damages suffered by Standard Oil Company in the accident resultant from the acts or omissions of Park. Plaintiff was obligated, under the policy issued to Park, to defend the action which Standard Oil successfully prosecuted to judgment against Park.

Plaintiff has contended and argued that Park was not covered because of the exclusions contained in the policy, e. g. "Exclusions" (1), supra.[2] The Court finds that the damage suffered by Standard Oil Company does not constitute injury to or destruction of property arising out of the collapse of or structural injury to any building or structure due to grading of land, excavation, borrowing, filling, backfilling, tunneling, pile driving, coffer-dam work or caisson work within the meaning of such standard insurance clause. Park has been judicially determined to have been negligent in failing to exercise due care as an engineer to provide necessary means to prevent movement of earth of adjoining property and to protect the improvements thereon, which it was Park's duty to do. Park was negligent in the manner in which Park directed the filling of the particular area in that it did not follow the usual sound engineering practices at this particular time and place as it was reasonably expected to do and should have done.

Park entered into a verbal contract with landowners, HSM Ventures, to provide engineering services for the Waipahu Industrial Park Development. Evidence before the Court does not disclose this contract in detail, but there can be little doubt that Park contracted to provide competent engineering services and the policy expressly recites under a continuation of (1) supra (Footnote 2) "provided, however, this exclusion does not apply with respect to liability assumed by the insured under any contract covered by this policy * * *". It was the very nature of Park's business to contract to provide professional engineering services to others and whether expressly or impliedly, Park did assume liability for the competence of the services rendered.

Plaintiffs make the further contention that by Amendatory Endorsement to the policy:

"It is agreed that such insurance as is afforded by the Policy Excludes:

"1. The hazard arising out of faulty design, maps, plans and specifications.

"2. Coverage for claims arising out of the operations of contractor."

In the light of what has been said above, and the evidence before the Court, the damage suffered by Standard Oil Company did not come about as a hazard so arising. The evidence does not

point to any faulty design, any faulty map or fault of any kind in plans and specifications. The evidence does indicate that the development and grading plan which Park had prepared and submitted for approval to Lum and to the City and County of Honolulu was workable and that, had it been followed, the accident would not have happened. Park directed additional fill material to be placed upon the critical area through its own negligence and without compliance with sound engineering practices dictating the procedure, which Park should have undertaken. It is equally clear that coverage of claims arising out of the operations of contractors is not involved. The contractor placed the extra fill material as a part of his operation, to be sure, but the evidence presented makes it abundantly clear that no liability of any kind attached to the acts of the contractor. Certainly no immunity flows to the insurer in this action under paragraph 2.

Along the same vein plaintiff now argues that the exclusions contained in the body of the policy coupled with the endorsement to the policy, absolved First Insurance from any liability, either by way of damage or by way of providing a defense to the insured. First Insurance is no amateur in the insurance business. From the events which have transpired there can be very little doubt that First Insurance thought coverage had been extended to Park. Although the foregoing has been directed primarily toward the policy issued to Park, no distinction can be drawn between the Park policy and that issued to Lum. Fundamentally they are the same. Minor differences which exist have been noted above.

It follows from what has been recited above, and the Court specifically finds, that coverage was provided to Park and to Lum by the respective policies issued by First Insurance and also by Continental. As pointed out on page 5 of Plaintiff's Trial Memorandum (R. 86), the bare allegations of the complaint against the insured did point to a conceivable liability under plaintiff's policy.

Accepting plaintiff's argument as to the possible liability of plaintiff, the complaint also pointed to a conceivable liability under defendant's policy coverage and allegations of a complaint must be the initial test to be applied. Even though the policy issued by First Insurance professed to be a Comprehensive Liability Policy and the Continental a Professional Liability Policy, boiled down to essential provisions, the policy issued by First Insurance contains what the insurance trade knows and terms the "pro-rata" clause. Distinguished therefrom, the Continental policy is of the "excess insurance" type.

■ This Court's research fails to disclose any judicial interpretation by the courts of Hawaii tending to determine whatever conflict may exist between the two types of policies, both of which purport to restrict or escape liability for a particular risk in the event that there is other insurance. It seems unfortunate to this Court that the parties to this action did not seek adjudication of their problem before the Hawaii State Courts. At this juncture this Court can only make a best guess that Hawaii, when directly faced with this problem, will in all probability adhere to the prevailing view under which it appears that in situations where one policy contains a "pro-rata" clause, and the other an "excess" clause, the "excess" clause governs and the insurer under the "excess" clause is not liable until the company having the "pro-rata" clause has paid to the extent of its policy liability. 76 A. L.R.2d 502–511; Travelers Insurance Co. v. Peerless Insurance Co. (Cir.1961), 287 F.2d 742, 748; General Accident Fire and Life Assurance Corporation, Ltd. v. Continental Casualty Company, 287 F.2d 464, 467 (9 Cir. 1961).

In connection with the Court's effort to review the plethora of divergent holdings which have surrounded this area (although this has no effect on this Court's decision), the Court can not re-

frain from noting that leading companies in the casualty field have done very little to help themselves, all at the ultimate expense of insured. We all know the enormity of the casualty insurance business, and that the major companies are "Board Companies," or companies which subscribe to standard forms of insurance coverage for which Board of Underwriter Actuaries calculate appropriate rates. Problems of this type should be resolved by and within the insurance industry.

A review of the cases clearly indicates many instances where a dispute of this nature between companies has left an insured in a position of doubt as to which company, if either, would provide legal defense. The ensuing litigation, which is essentially collateral to the liability against which the insured sought protection, cannot but provide a source of considerable annoyance, inconvenience and possible expense to the insureds. It appears rather obvious, in light of the results reached by some of these cases, that too often the insured has paid a substantial premium which provided him a duplication of coverage, or, on the other hand, perhaps far less coverage than was supposedly in force. This Court does not feel that judicial legislation in this area is at all desirable or that it will provide an ultimate or expedient solution to the problem. It would behoove the people in the business to put their houses in order by the use of clauses which have preagreed, acceptable, and understandable meanings. Failure to so accomplish such a result is likely to generate remedial legislation to effectively regulate the meaning of "other insurance" clauses, and may well result in overregulation of such details in a manner undesirable to the industry.

The Court will not here attempt to recite all of the various views which have been expressed regarding factual situations similar to those presented by the instant case or to differentiate the many variations which slight deviations may create. The briefs submitted by the respective parties to this action seem to cite most of the pertinent authorities. Although preponderance of the litigation which has taken place seems to involve liability policies providing protection to automobile owners and users, the reasoning which has evolved quite generally applies to the situation which this case presents.

In view of all of the foregoing, the Court has concluded that no great harm in law or equity befalls the parties by the Court leaving the parties as they came to court, especially in the light of the vague and inconclusive wording of the exclusions and other provisions involved.

■ First Insurance did defend the named insured and made a compromise settlement of damages for the liability which the insured had incurred. In this regard, the Court finds that the First Insurance policy contained a "pro-rata" type of "other insurance" clause, whereas the Continental policy contained an "excess" other insurance clause. Adopting the majority view as being that which Hawaii is most likely to adopt, we reach the same result, e. g., that the Continental policy being "excess" insurance, becomes liable only in the event that a liability in excess of the limits of coverage by First Insurance came into being, which did not happen in this case. The separate claim for attorney fees causes no different result. Plaintiff was liable to defend and did so. In addition to defendant's policy being "excess," it did provide for other deductions.

Reasoning from a recognition that obligation to defend is separate and apart from prescribed limits of liability for damages, and even assuming that a "pro-rata" clause was to be given effect over the "excess" clause, defendant would not become liable to plaintiff until its pro-rata share of the defense of each case exceeded the deductible provisions. The Court cannot subscribe to any theory of subrogation under the facts presented. Accordingly the Court finds for the defendant and against the plaintiff and hereby directs that plaintiff take noth-

ing by reason of the matters and things alleged in this action.

The foregoing decision will constitute the Court's Findings of Fact and Conclusions of Law.

Judgment will be entered accordingly.